1  IN THE UNITED STATES DISTRICT COURT
   NORTHERN DISTRICT OF ILLINOIS
2  EASTERN DIVISION

3

UNITED STATES OF AMERICA,          )   No. 06 CR 919-1
4
              Plaintiff,           )
5
           v.                      )   Chicago, Illinois
6                                  )   September 30, 2008
DERRICK SHAREEF,                   )   9:50 a.m.
7
              Defendant.           )   Sentencing
8

9            TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE DAVID H. COAR
10

11 APPEARANCES:

12

For the Government:        HON. PATRICK J. FITZGERALD
13                         United States Attorney, by
                           MR. SERGIO E. ACOSTA
14                         MS. CARRIE E.  HAMILTON,
                           Assistant United States Attorneys
15                         219 South Dearborn Street
                           Suite 500
16                         Chicago, Illinois  60604

17

For the Defendant:         MR. DONALD V. YOUNG
18                         20 North Clark Street
                           Suite 1725
19                         Chicago, Illinois  60602

20

21

22

23          TRACEY DANA McCULLOUGH, CSR, RPR
                 Official Court Reporter
24              219 South Dearborn Street
                      Room 1420
25              Chicago, Illinois 60604
                   (312) 922-3716

1       THE CLERK:   06 CR 919 defendant 1, USA versus Derrick
2   Shareef, sentencing hearing.
3       MR. ACOSTA:   Good morning, Your Honor.  Sergio Acosta
4   and Carrie Hamilton for the government.
5       MR. YOUNG:   Good morning, Your Honor.  Donald Young
6   for Derrick Shareef, who's present for sentencing.
7       THE COURT:   Good morning, Mr. Shareef.
8       DEFENDANT SHAREEF:   Good morning, Mr. Coar.
9       THE COURT:   Mr. Shareef, did you receive a copy of the
10  presentence report?
11      DEFENDANT SHAREEF:   Yes, sir, I did.
12      THE COURT:   Did you have a chance to read it?
13      DEFENDANT SHAREEF:   Yes, sir, I did.
14      THE COURT:   All right.  Did you have a chance to
15  discuss it with your attorney?
16      DEFENDANT SHAREEF:   Yes, sir.
17      THE COURT:   Now, I've received the defendant's
18  sentencing memorandum and the defendant's objections and
19  motions to strike a portion of the presentence report.  What's
20  the government's response to that latter document, the
21  objection and motion to strike the portion of the presentence
22  report?
23      MR. ACOSTA:   Your Honor, as to those particular lines
24  of the presentence investigation report, we have no objection
25  to the defendant's motion, Judge.  Those are lines 300 to 308

PDF created with pdfFactory trial version www.pdffactory.com

3

1    of page 10.

2            THE COURT:    All right.  Those will be stricken.

3            MR. YOUNG:    Thank you.

4            THE COURT:    Let's review for a second the guideline

5    calculations.  The probation officer has calculated a total

6    offense level of 43 and a criminal history category of 1, for a

7    guideline sentence of life in prison.  Now, I can't remember a

8    case in which the portrayals of the defendant were as different

9    as in this case.  The defendant through the sentencing

10   memorandum portrays an impressionable young man who fell under

11   the sway of an informant, a paid informant, who suggested the

12   events that underlie the charges in this case.

13           Now, have I accurately described that, Mr. Young?

14           MR. YOUNG:    Yes, you have, Judge.

15           THE COURT:    All right.  The government's portrayal and

16   the description of the offense in the presentence report is

17   quite different.  So for purposes of Section 3553 I'd like to

18   hear a little bit more about which is the accurate description

19   of Mr. Shareef.  I don't know whether either party had planned

20   to call witnesses, but I would really appreciate getting a

21   little bit more information about Mr. Shareef and his

22   involvement in these matters.

23           MR. ACOSTA:    Your Honor, if I may, may go first.  And

24   before I do, Judge, with respect to the guideline calculations.

25           THE COURT:    Yes, sir.

4

1      MR. ACOSTA:   I would note simply that we had not
2   previously made a motion, although we would at this time, for
3   the third level off for acceptance of responsibility, which I
4   believe would make the guideline range 360 months to life.
5      THE COURT:   Oh, all right.
6      MR. ACOSTA:   Judge --
7      THE COURT:   Just for the record that motion will be
8   granted.
9      MR. ACOSTA:   Thank you, Judge.  Your Honor, as the
10   Court has noted, the gist of the defendant's sentencing
11   memorandum is that Mr. Shareef was somehow led astray by the
12   informant in this case.  However, Judge, in looking at the
13   defendant's memorandum, I would simply point out the fact that
14   after discussing generally his background, the fact that he
15   grew up without his father in the home and so forth, on page 2
16   of the memorandum Mr. Young simply goes to September 2006,
17   which is when the defendant met the informant in this case.
18      What is not included in there, Judge, is what Mr.
19   Shareef had been involved in prior to ever meeting the
20   informant in this case.  Specifically, Judge, in about 2002 or
21   2003 Mr. Shareef moved to Phoenix, Arizona, where after a
22   period of time he moved in with an individual Hassan
23   Abu-Jihaad.  Mr. Abu-Jihaad, Your Honor, was convicted in March
24   of this year for providing material support to terrorists and
25   espionage.

1    Mr. Shareef has acknowledged that when he was with

2 Abu-Jihaad living together, they discussed justification for a

3 violent jihad. They discussed a possible attack on a naval

4 base in San Diego, California to the point where they even

5 talked about how many individuals it would take, how it would

6 be carried out, the use of firearms in that type of an attack.

7 Mr. Shareef acknowledged to the informant that while he was

8 with Abu-Jihaad, Mr. Shareef had gone and looked at a

9 particular military recruiting center and had thought out for

10 himself how easy it would be to carry out an attack on that

11 recruitment center.

12    I would note also that in the presentence report, Your

13 Honor, Mr. Shareef's mother acknowledged and makes a statement

14 that when Mr. Shareef came back to Illinois to live with her,

15 she noted that he was more militant in his approach to things.

16 That is consistent with the influence on Mr. Shareef by

17 Mr. Abu-Jihaad.

18    During that time before he met the informant, he moved

19 back, Judge, to Illinois in December of 2005. Again, not

20 meeting the informant until sometime around September 2006.

21 Prior to that time when he was more militant after he had

22 discussed carrying out these attacks, Mr. Shareef began

23 downloading violent videos off of the internet. Now,

24 certainly, Judge, he's got a First Amendment right to download

25 whatever he wants, virtually anything he wants from the

1  internet, but this is indicative of the state of mind that Mr.

2  Shareef was in at that point.

3      In addition, he was looking at and downloading jihadi

4  training videos.  He then acknowledged, Judge, both in his

5  postarrest statement and to the informant during the course of

6  the investigation that while he was there, he began considering

7  different attacks.  Specifically he went to Map Quest to find

8  the location of a synagogue in DeKalb, Illinois, which is near

9  Genoa.  He also talked about how he would carry out an attack

10  on a courthouse in DeKalb.  And referring, Judge, if I might to

11  the government's version.

12      On December 1st, 2006, after Mr. Shareef and Mr. --

13  the informant had gone to the mall, the CherryVale mall to case

14  it and to plan out their attack, Mr. Shareef spoke to the

15  informant about his, meaning Mr. Shareef's state of mind before

16  he ever met the informant.  And these are Mr. Shareef's words,

17  Your Honor:  "I probably would have eventually just ended up

18  stabbing the shit out of some Jews or something.  Just stabbing

19  them niggers with a steak knife.  Dude, I ain't going to lie.

20  During the war with Hebullah, man, I had already started to

21  look at synagogues out here and in the DeKalb are and

22  everything.  I was looking at synagogues.  I was doing Map

23  Quest.

24      One of them is down the block from the masjid,"

25  meaning mosque.  "I knew that they do their thing on Saturdays,

1    right.  I was like, I'm going to lay low out here.  I'm going

2    to camp out overnight, be out there on Friday night after jumma

3    or Saturday morning about 12 or 1:00 o'clock I be there.  And

4    as soon as I see them fools going in the building, I had

5    planned on trying to grab one, depending on how it was, niggers

6    trying to run in the building all at once and open up shop.  I

7    was just going to go over there and shank one or two of them."

8         Judge, he also described his thoughts about quote,

9    clocking the first three niggers at the door of the DeKalb

10   County courthouse and smoking a judge, quote, unquote at the

11   courthouse.  These are thoughts, these are things that he had

12   looked into beyond his thinking about, Judge.  He actually

13   located these places, went and looked at how he could carry out

14   such an attack.  And by his own words had he not met the

15   informant, these are things he would have done.

16        So with respect to the informant somehow leading him

17   astray, Judge, this was a man who was a ticking time bomb.  He

18   was ready to take action before ever meeting the informant in

19   this case.

20        And, Judge, it also portrays I think unfairly in the

21   sentencing memorandum the defense has filed that somehow the

22   informant had an iron grip over Mr. Shareef.  These two men had

23   a number of conversations.  Mr. Shareef during the course of

24   the investigation actually traveled on his own to Phoenix,

25   Arizona where he again met with Mr. Abu-Jihaad.  At that time

1    he was looking for some sort of a material support, money from

2    Mr. Abu-Jihaad.  He also discussed with Abu-Jihaad whether or

3    not Abu-Jihaad was interested in buying some rifles that Mr.

4    Shareef believed he was in a position to broker between someone

5    who was posing as a supplier of weapons and Abu-Jihaad.

6              So he's traveling on his own.  He's engaging in other

7    conversations, all of these things during the course of the

8    investigation, Judge.  It's simply not fair to say -- it's not

9    accurate to say that the informant is who led Mr. Shareef

10   astray.  This is not unlike many other cases where informants

11   are utilized in the course of an investigation, whether it be

12   in the drug context or some other context.  These are

13   individuals who are already predisposed to engage in criminal

14   activity.  And all that is done is as an investigative tool Mr.

15   Shareef was provided an opportunity to carry out what clearly

16   would have been a horrible attack on that mall, Judge.

17             And just to finish up with my statement to you.  The

18   attack itself in this case, Judge, without question would have

19   been a most horrific event.  Mr. Shareef by his own words as

20   noted both in the presentence report and in the government's

21   version, fully intended to carry this out at the height of the

22   holiday shopping season, with many many people present, and

23   specifically placing grenades in trash cans, Judge.  Mr.

24   Shareef talks about how it would be shrapnel, how it would be

25   chaos.  80 million people running around.  There is no question

1    but that he intended to carry this out, that it would have

2    killed innocent people.  And I can't think of a more serious or

3    heinous crime that an individual could commit.  And yet, that

4    is what Mr. Shareef was planning to do and was ready to do and

5    took steps to carry out.

6            Finally, Your Honor, I would note simply that -- and

7    hopefully today if Mr. Shareef chooses to address the Court, he

8    will express some remorse for his actions.  He hasn't done so

9    to date, Your Honor.  Mr. Shareef may be sorry that he got

10   caught, that he believed -- he may be sorry that he believed

11   that this was all real, that it was actually going to happen,

12   that he'd be able to carry it out.  But he has not, Judge, to

13   date expressed any remorse for what it is that he actually was

14   prepared to do and what he tried to do and the innocent lives

15   that would have been taken had he actually been in a position

16   to carry that out.

17           So again, I don't know what his plan is, but that is

18   something that has been lacking to date, Judge.  And I think

19   that's something -- a factor that the Court ought to take into

20   consideration.  We acknowledge, of course, that he's a young

21   man.  We recognize, as a matter of fact, I think today is his

22   24th birthday, Your Honor.  But he was not a child when all of

23   these events were taking place.  He was a grown man.  He had

24   had plenty of time to form his opinions, form his ideas before

25   he ever met the informant.  And there was nothing untoward with

1   respect to the informant's activities in this case or the

2   investigation.  The investigation was carried out very

3   professionally and appropriately under these circumstances, and

4   a horrible attack was stopped as a result.

5            So, Judge, we do believe that in light of the

6   seriousness of the crime that Mr. Shareef stands convicted of,

7   that a guideline sentence is appropriate.

8            THE COURT:   Mr. Young.

9            MR. YOUNG:   Thank you, Judge.  First of all, with

10  respect to the sentencing memorandum, that expresses my opinion

11  and my belief of how things transpired here.  I want to make

12  very clear that Mr. Shareef does not blame the informant, does

13  not point the finger at anybody.  He accepts full

14  responsibility for what he did.  I do think and I disagree with

15  the government to the extent that this was not a normal

16  situation with an informant, and I'll comment on that in a

17  second.

18           But I want to go back to the beginning.  How did this

19  all get started?  When Derrick was about 13 years of age living

20  in Detroit, he got interested in Islam.  Unfortunately the

21  mosque that he started to attend and the people that he

22  affiliated with had some very radical briefs.  He's 13, 14,

23  years of age at the time.  Doesn't really know, doesn't have

24  the sophistication or the maturity to figure out what's really

25  right and what's wrong and what's legitimate and what's not.

1    His mother, who he was living with at the time, who is

2    in court this morning, by the way, was very concerned about the

3    influences that Derrick was being subjected to.  So she wanted

4    to get him out of Detroit and get him out to Arizona, and

5    hopefully he could live with his father and get away from these

6    bad influences.  That actually backfired because Derrick's

7    father's wife at the time was not accepting of him.  It was a

8    very difficult situation.  He was essentially thrown out of

9    that house.

10    And the government mentioned Mr. Abu-Jihaad.  And

11    interestingly enough, Derrick in a sense went from the frying

12    pan into the fire, because now he gets hooked up with an

13    extreme radical individual, who kind of takes him under his

14    wing and continues to generate the seeds that had been planted

15    back In Detroit.  And actually this really helped set the stage

16    for what ultimately happened in Rockford, because now Derrick

17    has been given these pseudoreligious beliefs that he embraced

18    and with a foundation.

19    He then hooks up with Abu-Jihaad, clearly as radical

20    an individual as on the plant Earth, and Derrick doesn't really

21    understand what's rights, what's wrong.  He's looking for a

22    role model.  He's looking for someone to identify with.  All

23    his life he's never really had somebody that he could rely on,

24    that he could look up to.  And unfortunately the role models

25    that step into these shoes are the worst possible people.  Now,

PDF created with pdfFactory trial version www.pdffactory.com

1    he's not pointing the finger at that.  But I'm trying to give

2    an explanation as to how this evolved.

3            As Your Honor knows, I came into this case kind of

4    late.  I filed my appearance after there had already been a

5    guilty plea entered.  And I have read a whole lot of

6    information, all of the pleadings, all of the filings, the

7    affidavits, the proffers that he had given, the witness 302's,

8    hours and hours of transcripts.  And I still remember vividly

9    the first time I sat down with this young man at the MCC.  I

10   had an image of what this individual was like, and I was

11   completely taken aback about what a thoughtful and mostly

12   respectful young man this was.

13           It didn't make any sense to me.  There was no

14   connection between the individual I was talking to and what I

15   had read and the preconceived notions that I had developed

16   based upon all of this information.  And as time went on I

17   started to get a little bit different flavor when I started to

18   hear some of the things that he explained as to how this played

19   out.

20           I do disagree with the government to the extent that

21   this informant was -- you know, this was a normal situation,

22   the man acted professionally.  In my opinion far from it.

23   Because what really happened here was you did not have --

24   unlike the normal situation you didn't have a person who was

25   involved in criminal activity and then an informant shows up on

1   the scene and creates the opportunity. Way way far away from

2   that situation. This was a man who basically took him into his

3   home, who developed a father/son relationship. Provided

4   everything that a good father would give, a comfortable home

5   and meals and drove him to work and offered the use of his car.

6   This is for the first time in his life somebody that he could

7   really look up to and talk to.

8         Now, in that situation Derrick already has some pretty

9   crazy ideas floating around in his head, and the informant in

10   my view completely manipulated and exploited those to set out a

11   pattern of conduct that eventually culminated in his arrest.

12   And Derrick has had time to think about where he went wrong,

13   and he understands what happened here. Again, he does not to

14   his credit blame the informant, but he does understand what

15   happened and how this all snowballed, how this plan evolved.

16         So he also realizes that the tenets and the principles

17   that he learned at an early age and that were fostered by Mr.

18   Abu-Jihaad were really pseudoreligious principles. He

19   understands now that that's not true Islam. He spent many many

20   hours every day basically reading the Koran, studying Islam.

21   He's come to an understanding of what the true religion stands

22   for, and it wasn't what he was the spoon fed as a child

23   essentially.

24         Judge, with respect to the sentence, I would suggest

25   to Your Honor if the punishment is supposed to fit the crime,

PDF created with pdfFactory trial version www.pdffactory.com

1    then these guidelines are just not an accurate barometer of the

2    punishment for what's involved here. Derrick is not a violent

3    person, never has been. This event never really happened.

4    He's an individual with no criminal history. You know, nobody

5    was hurt here. There was no property damage. This is a young

6    man that has tremendous potential. And in my view he -- yes,

7    he admits he made a mistake, but he's entitled to an

8    opportunity to redeem himself. He's entitled to have a second

9    chance, Judge.

10           I know that it's frequently stated that past

11    performance can generally be a reliable indicator of future

12    conduct. And I would suggest, Your Honor, that that principle

13    is applicable here in two very important respects. Number one,

14    you have an individual who, yes, he's talked -- he's seen the

15    internet just like a lot of the young kids. He's seen videos

16    and all kinds of violent stuff, but he's never been a violent

17    person. He's never perpetrated a criminal act. He has no

18    criminal history. And so if you apply the principle of his

19    past behavior, then I think it's very fair to conclude that

20    this event would have never happened, this act would never have

21    occurred.

22           He had already expressed reservations and doubts in

23    the weeks leading up, but the informant was basically

24    challenging him, no, you have to do this. He was exploiting

25    their relationship to bring him along to the point where he was

PDF created with pdfFactory trial version www.pdffactory.com

1   arrested.  And the other reason, Judge, that I think his past

2   performance is important is I believe Your Honor's decision

3   will have a lot to do with how you view whether or not he's a

4   violent person, whether or not he's a danger to society.

5           When you look back at his prior life, other than some

6   extreme rhetoric, he's never been involved in any kind of

7   violence or in any violent act.  So, Judge, I would ask that

8   you consider those factors in imposing sentence.  Thank you.

9           THE COURT:   Now, I'm going to give Mr. Shareef an

10  opportunity to be heard, as is his right.  But before we do

11  that, it is my practice generally to give the defendant the

12  last word.  Does anybody have anything more to submit,

13  witnesses or otherwise, on these matters or any other matters

14  before we hear from Mr. Shareef?

15          MR. YOUNG:   No, Your Honor, not for the defendant.

16          MR. ACOSTA:   Your Honor, the only thing I would note

17  is we do have the case agent present if Your Honor would have

18  any questions of the case agent with respect to the

19  investigation.  We also can provide to Your Honor certain of

20  the videos and so forth that were obtained from Mr. Shareef's

21  computer, a video that Mr. Shareef made prior to the planned

22  attack here, what could be referred to as a martyrdom video,

23  but certainly one where he's expressing the intent of his

24  actions and what the expectation is that will occur afterwards.

25          But other than that, Judge, we have no witnesses to

PDF created with pdfFactory trial version www.pdffactory.com

1    present.

2            THE COURT:    Mr. Shareef, do you have anything to say

3    before sentence is imposed?

4            DEFENDANT SHAREEF:    Yes, sir, Mr. Coar.

5            MR. YOUNG:    Judge Coar.

6        (Whereupon, the defendant spoke in Arabic.)

7            DEFENDANT SHAREEF:    Mr. Coar, the truth of the matter

8    is is that there's been a lot of extras put on both sides of

9    the story on behalf of my attorney as well as the prosecution.

10           In about 2001 I became a Muslim in the correct and

11   appropriate manner, and I was 16 at the time.  At this point in

12   time I was educated on the fundamentals and the basics of

13   Islam, and I got it down pretty quick, relatively quick.  I

14   spent days in in the masjid in Detroit.  It was at this time,

15   however, during the course of this year that the events of 9/11

16   transpired.  And after these events transpired I began to

17   notice differences with regards to the way that the public

18   viewed me, because I always dressed as a Muslim.  I wore my

19   turban, I wore my long robes, and things of that nature.  So I

20   began to notice a different attitude from the open public

21   towards me as well as minor elements of people I was involved

22   with and that I knew who had radical or extreme views.

23           But the majority of the radicalism and extremism that

24   I was subjected to did not come from individuals that I met.

25   Rather it came from television.  I was exposed to seeing the

PDF created with pdfFactory trial version www.pdffactory.com

1    rhetoric and the propaganda of individuals like Osama bin Laden

2    and Hassan Mutrellah, (phonetic), Mullah Omar, individuals that

3    are the leaders of the Taliban, al-Qaeda, Hezbollah, all

4    deviant groups that are misguided.  Through an individual that

5    I had respect for when I was in my early stages of Islam, he

6    had referred to Osama as a sheik, as a scholar, and this was an

7    individual whom I had never heard of being Osama, had no

8    knowledge of this individual.

9         So when a person that I respected and admired referred

10    to him as a sheik and as a scholar, then that is what opened

11    the door initially for me to accept those views because I began

12    to through lack of education concerning the truth of Islam

13    accept his views because I had no knowledge to make the

14    distinction.  And so this was actually the most significant

15    source behind my extreme deviance and my belief and my

16    practices.

17         And when I moved to Phoenix, I was 17, I was 17 years

18    of age.  The situation as is my attorney explained with regard

19    to my father.  I lived on my own.  I had a job, and it was

20    difficult for me to make ends meet.  So right around my 18th

21    birthday I became acquainted with an individual named Hassan

22    Abu-Jihaad.  From the time that I met Hassan Abu-Jihaad he has

23    never shown me any extremism or any radicalism.  This is

24    completely contrary to what both my attorney says and what the

25    prosecution says.  I have never known Mr. Abu-Jihaad to

PDF created with pdfFactory trial version www.pdffactory.com

1    demonstrate this type of behavior.  In fact, as I previously

2    stated, I was already exposed to that extreme ideology before I

3    met Mr. Abu-Jihaad.  And this was something that I used to keep

4    concealed.  I didn't go around, you know, wearing my colors on

5    my sleeve, so to speak.

6         At this point when I became acquainted with

7    Abu-Jihaad, he encouraged me to better my life situation.  He

8    paid for my GED classes.  He paid for me to enroll in college.

9    I took college courses as a graphic designer.  He introduced me

10   to my fiancee.  He helped me get a job.  You know, these are

11   the things that Hassan had influence over me concerning.  And

12   when I met Hassan, I had no idea that he was under

13   investigation for whatever he was convicted for.  I had no

14   knowledge of this.  I had no intentions to seek knowledge of

15   this.  And our relationship was not centered around any sort of

16   radial brotherhood or any extremism.  Rather, it was more like

17   he looked at me as a younger brother and I to him as an older

18   brother.  And our relationship did not exceed anything of that

19   nature.

20        It is true when I lived in Phoenix that I did go to a

21   military recruitment center.  However, it is not true that I

22   went to this military recruitment center with the intention to

23   conduct an attack of any sort or to map out the place or look

24   for any soft targets or anything of the nature.  I actually

25   went to take an ASVAB test because I was considering joining

PDF created with pdfFactory trial version www.pdffactory.com

1    the Navy.  And I told one of the recruitment officers there

2    that it was a Navy Seal or nothing.  There was nothing less

3    than that that would be acceptable to me, but I did note

4    certain things in the area with regard to how many people were

5    there and the way that an individual could conduct some sort of

6    attack there, but this was not the purpose of that.  This is

7    just something that through paying attention to details that I

8    just happened to see.

9            But I later changed my mind and decided to move out

10   here where my mother is, because I got kind of homesick living

11   in Phoenix.  All my family had relocated from there.  So at the

12   time when I moved out here -- or actually before I moved out

13   here, I would like to note that I owned an assault rifle.  And

14   I had this extreme ideology.  The assault rifle that I owned

15   was purchased legally and it was registered.  And my personal

16   views and my own ambitions never drove me to violate the trust

17   of owning a rifle legitimately, nor did they -- I had no ideas

18   or any intentions to violate that trust.

19           So I would like for that to be on record so that you

20   may know that I have also had opportunities if that's how you

21   will view it where I could have made a foolish mistake and done

22   something foolish.  But this was not, this was not how I wanted

23   to conduct my life.  You know, this was an ideology that was

24   lying dormant within me, but it wasn't the major factor of my

25   life.  So when I moved out here to the DeKalb area, I had no

PDF created with pdfFactory trial version www.pdffactory.com

1    contact with Abu-Jihaad whatsoever.  I hadn't contacted him for

2    about a year when I moved out here.

3            In fact, it was not a very large Muslim community out

4    here.  I had no contact with any Muslims.  And after about a

5    year and a half maybe I went to the DeKalb and -- or I went to

6    the masjid in DeKalb, and it was then when I -- I began to get

7    back into my practice of my religion and my faith.  And at this

8    time I contacted Hassan Abu-Jihaad again and reestablished my

9    relationship with him.  And shortly thereafter within the

10   period of several months I was introduced to the informant.

11           Now, my relationship with the informant was -- it was

12   like he was an individual that I looked up to.  I respected

13   him.  I respected his opinion because I had never met an

14   individual who had possession of the amount of knowledge that I

15   felt he possessed.  He could speak Arabic fluently.  He could

16   read it.  He could write it.  He lived with two wives.  He had

17   five children.  You know, just a really -- what I seen to be a

18   really healthy environment.

19           He told me he can instruct me in my religion, and this

20   is what I desired for myself.  My rabid ideology was always

21   there.  It was dormant, though.  It didn't dictate my life.  It

22   didn't dictate my actions and it didn't dictate my speech.  It

23   was just something that was there because of a misunderstand-

24   ing.  But this -- as I stated, this was developed through the

25   rhetorical propaganda from the life of Osama bin Laden and

PDF created with pdfFactory trial version www.pdffactory.com

1    Hassan Mutrellah, (phonetic).

2          When I met the informant, I was in a bit of a

3    situation in which I needed help and assistance from wherever

4    it could come from.  I was currently 21 years of age.  I was 21

5    years of age at the time when it happened.  The informant

6    introduced himself to me.  He was very pious.  He had a very

7    humble demeanor, and he spoke about brotherhood and brothers

8    taking care of one another, and this was a duty to one another.

9    So at the time when I met the informant, this is what I was

10   upon.  I was working.  I had already been introduced to my

11   fiancee.  I was trying to establish my own independence.  I was

12   trying to get my apartment and be able to afford my car

13   insurance basically.

14          This day in particular I had intentions to go and stay

15   with one of my co-workers.  This was the first day of Ramadan

16   or Ramadan was to begin the next day.  And I had seen the

17   behavior of my co-workers previously.  You know, I realized

18   that they were into alcohol.  They were kind of like, like the

19   party college type, if you will.  And so I didn't see this as

20   being a healthy environment for me when I was trying to

21   strengthen my religion, my faith and my religion.  So I made

22   the conscious decision to go with the informant, who unbeknown

23   to me at the time was an informant.

24          Over the course of the first several weeks I would say

25   the informant never indulged or engaged me in any type of

PDF created with pdfFactory trial version www.pdffactory.com

1  radical dialogue that was detrimental to me.  At least I don't

2  recall any.  However, he found out from I guess -- I'm pretty

3  sure he already knew given that he was an informant, but he had

4  knowledge that I had some deviant and extreme views, and he

5  actually played what is today a significant role in actually

6  deterring me from having this radical ideology because he

7  criticized me from accepting from the likes of Osama bin laden,

8  having this al-Qaeda ideology, this (Arabic phrase), if you

9  will, pardon the translation.

10         But he deterred me from this, but at the same time he

11 called me to conduct this offense that I'm being charged with,

12 which later on it added to my confusion, because I recall

13 telling him on one occasion but isn't what we're doing just

14 like what they do?  And they being the members of al-Qaeda

15 suicide bombers, and the like, what have you.  I said isn't

16 what we're doing similar to what they're doing?  Because, you

17 know, the only difference is that you're telling me that now

18 we're on the right path, but the results and the offense is

19 still the same.

20         This is something that I began to question because I

21 had been -- my horizons had been broadened.  I had more

22 knowledge to view it from a different perceptive.  However, he

23 had such a sway over me to where I accepted from him based upon

24 him being seen in my eyes as someone who had knowledge.  I

25 didn't see him as an individual who would knowingly or

PDF created with pdfFactory trial version www.pdffactory.com

1  willingly misguide me.  My intentions from the beginning of

2  this all was just that I thought that I was doing something

3  that was acceptable, something that was the truth and something

4  that would be rewarded.

5          I did have knowledge that this was against the law in

6  regards to the United States law.  But I had the understanding

7  that this was something that was acceptable in Islam.  This was

8  something that was commended, and this was something that

9  honors and exalts the participants.  So it is true that I did

10  have intentions to conduct this offense.  My intentions were

11  never to completely annihilate and destroy and hurt people.

12  Rather, my intentions were to bring victory to Islam and the

13  Muslims, and I thought that this was the way to do it.

14          I no longer feel this way, and this is due to seeking

15  and acquiring knowledge by the mercy of the Lord.  I have the

16  complete understanding that this methodology and this ideology

17  that I had is deviant.  And I actually understand how it's

18  deviant and the signs behind the deviation.  So I no longer

19  accept from the likes of Osama bin Laden.  I no longer feed

20  myself this poison that corrupts me.  I know now that the way

21  for the Muslims to achieve victory is through purification and

22  education, because it was the lack of education that allowed me

23  to be deceived in the first place.  And proper knowledge would

24  have prevented all of this.

25          I do, however, believe that with the sway and the

PDF created with pdfFactory trial version www.pdffactory.com

1　amount of influence that the informant had upon me he could

2　have completely deterred me from this action, because he was

3　the one that first opened up the part of me that had doubts

4　about this being correct in the first place.  So I believe that

5　he could have expounded on that and further elaborated upon

6　that and completely deterred me.  And I do believe at the same

7　time that that would have been the best way to avoid this

8　offense.  Rather, he facilitated to these things and encouraged

9　it.  And when I traveled to Phoenix, it was under his request.

10　And the government paid for it seeing as how they paid him.

11　And the money I received was from him, so they paid for this.

12　They were aboard the train.

13　　　　One question that has always been in my mind, Mr.

14　Coar, is why initially did the FBI even bother to investigate

15　me.  Because I was around 17 or 18 when I met Hassan

16　Abu-Jihaad.  And if you pay attention to how often that name

17　has come up, I believe that that is the answer to this inquiry

18　that I have.  I believe that Hassan Abu-Jihaad is the

19　individual that they were seeking to convict, and with that

20　being said they felt as though they could convict me and I

21　would cooperate with them in some way, shape, or form.

22　　　　I believe this sincerely.  Because as my attorney

23　said, I have no background and I have no criminal history.  I

24　have nothing of this nature.  So I would only have, you know,

25　questions as to why did they even have knowledge of me.  And

1    this was from my association with Abu-Jihaad, which was not

2    founded upon a radical or extreme brotherhood. I have not as

3    the prosecution stated shown much remorse or regret, but that's

4    only because there has not been much remorse or regret for me

5    to show I believe, because I haven't hurt anybody. There are

6    no victims. There is nobody who can step forward today and say

7    that I had harmed them or I took a family member from them or I

8    injured them.

9         Would you forgive me for the duration of this

10    speaking, Mr. Coar, but these are the things that I feel are

11    important for you to consider. In truth I'm not an extremist,

12    and I can only say this because I accepted that I used to be.

13    I was in denial and now I accept it. And I see and I

14    acknowledge. And I believe this to be the first step to making

15    a significant change. My change is not one that is to appease

16    anyone, because I'm in no position to do such a thing.

17    However, my change is sincere, and I'm the sole benefactor of

18    this change.

19         I would like for you to consider, Mr. Coar, that if I

20    was to be set in public and released, I will not be a threat.

21    I will not have any intentions to disrupt national security. I

22    will not have any intentions or ambitions to commit any sort of

23    offenses, to do anything of the nature that would bring me back

24    before you under any circumstances. And this is all that I

25    would like to say, Mr. Coar. Thank you.

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:   Thank you.  Mr. Shareef.

2          DEFENDANT SHAREEF:   Yes, sir.

3          THE COURT:   Each time that you have appeared in this

4    court you have been respectful, and I appreciate that.

5          DEFENDANT SHAREEF:   Thank you, sir.

6          THE COURT:   That's consistent with the description of

7    you contained in the sentencing memorandum, the letter from

8    your mother, and your attorney's words here today.

9          Mr. Young said that the offense in this case should be

10   tempered by the fact that you do not have a violent history.

11   That's true.  He also said and you suggested that because this

12   did not happen, because the plan never reached fruition, that

13   that ought to be taken into account.  And I was puzzled by that

14   when I heard it the first time, and I'm still puzzled.  But for

15   the intervention of the government this plan would have taken

16   place.  People would have been hurt.  There would have been an

17   explosion in a crowded area.

18         So I don't understand that the sentence should be

19   tempered by the fortuity that the government intervened.  You

20   said you have not shown remorse because there are no victims.

21   If the plan had been completed, there almost certainly would

22   have been victims.  And you would have had that on your

23   conscience.

24         Now, in the name of God many evil things have happened

25   throughout history.  The courts, the law cannot regulate what

PDF created with pdfFactory trial version www.pdffactory.com

1   people think. It can regulate behavior. And certain behaviors

2   are unacceptable. The behavior that gives rise to the charges

3   in this case is beyond the pale. It is unacceptable. You say

4   that you realize that now. I hope that's the case. I hope

5   that's the case.

6          But almost every defendant who appears in these courts

7   says that I've now seen the light. And if you just give me

8   another chance, it won't happen again. These are people

9   sometimes with criminal records as long as my arm, but yet

10  that's the recurring argument that they make. When I try to

11  balance the horrific nature of what could have happened, what

12  this plan could have led to versus my own view that you are at

13  base not an evil person, I have -- the balance comes out in

14  favor of a substantial sentence in this case, because my

15  personal view can't outweigh the potential risk of future harm

16  here.

17         Many years ago I read that in the governor's mansion

18  in the State of Alabama the people who worked there were all

19  convicted murderers. The feeling was that people who commit a

20  crime as terrible as murder but do it in the heat of passion

21  aren't likely to repeat that conduct again. Very risky, very

22  risky proposition. Here, however, your crime was not a crime

23  of passion. Your crime was a crime of planning, plotting,

24  taking affirmative steps to achieve a result over a period of

25  time.

1    So when I first thought -- I remembered that example,

2  I thought, well, that maybe describes Mr. Shareef. It does

3  not. It does not. Both to protect the public based on the

4  record, based upon your statements, based on what you did here

5  and to serve as a deterrent to others who would engage in

6  similar conduct, the sentence needs to be a substantial

7  sentence. You are a young man. I don't think that life in

8  prison is the appropriate sentence. I think that there is some

9  potential for you to lead a socially productive life both in

10  prison and out of prison.

11    Therefore, pursuant to the Sentencing Reform Act of

12  1984, it's the judgment of the Court that the defendant Derrick

13  Shareef is hereby committed to the custody of the Bureau of

14  Prisons to be in prison for a term of 420 months. It is

15  ordered that the defendant shall pay to the United States a

16  fine of $5,000. The costs of imprisonment and the costs of

17  supervised release are waived. A special assessment of $100 is

18  mandatory and payable immediately.

19    When released from imprisonment, the defendant shall

20  be placed on supervised release for a term of five years.

21  Within 72 hours of release from the custody of the Bureau of

22  Prisons the defendant shall report in person to the probation

23  office in the district to which the defendant is released.

24  While on supervised release, the defendant shall not commit

25  another federal, state, or local crime, shall comply with the

PDF created with pdfFactory trial version www.pdffactory.com

1   standard conditions that have been adopted by this Court and

2   shall comply with the following additional conditions:

3         During his term of supervised release the defendant

4   shall undergo a mental health evaluation and follow the

5   recommendations of the evaluation as directed by his probation

6   officer.  While on supervised release the defendant shall pay

7   10 percent of his net monthly income towards the fine.  The

8   defendant -- that assumes that it's not paid prior to that.

9   The defendant shall refrain from any unlawful use of a

10   controlled substance.  The defendant shall submit to one drug

11   test within 15 days of release from imprisonment and random

12   drug tests thereafter conducted by the U.S. Probation Office,

13   not to exceed 104 tests per year.  The defendant shall not

14   possess a firearm or destructive device.

15         Pursuant to 18 USC Section 3583 (d) the defendant

16   shall cooperate in the collection of a DNA sample if collection

17   of such a sample is authorized pursuant to Section 3 of the DNA

18   Analysis Backlog Elimination Act of 2000.

19         Are there any corrections or modifications to the

20   sentence?

21         MR. ACOSTA:   No, Your Honor.

22         MR. YOUNG:   No, Judge.

23         THE COURT:   All right.  Mr. Shareef, you have a right

24   to appeal the sentence that's imposed.  If you wish to appeal

25   and you cannot afford the costs of appeal, you may do so

PDF created with pdfFactory trial version www.pdffactory.com

1  informa pauperis; that is, without payment of costs.  If you do

2  that, the clerk is instructed to process the appeal as if the

3  costs had been paid.

4        Anything further?

5        MR. ACOSTA:   Your Honor, at this time the government

6  moves to dismiss Count 2 of the indictment.

7        THE COURT:   All right.  Count 2 is dismissed.  Thank

8  you very much.

9        MR. ACOSTA:   Thank you, Judge.

10                    CERTIFICATE

11        I HEREBY CERTIFY that the foregoing is a true, correct

12  and complete transcript of the proceedings had at the hearing

13  of the aforementioned cause on the day and date hereof.

14

15  */s/TRACEY D. McCULLOUGH*                    *November 3, 2008*

16  Official Court Reporter                      Date
    United States District Court
17  Northern District of Illinois
    Eastern Division

18

19

20

21

22

23

24

25